The first position taken, on the part of the counsel for the defence, is, that the act establishing the Superior Court of the city of Buffalo is not constitutional. By the first section of that act (Laws of 1854, ch. 96), it is declared that "itsjurisdiction shall in all cases be presumed." It was necessary, therefore, for the defendant Woodruff, who alone interposed this defence, to prove the facts necessary to rebut the presumption. It is urged that the Recorder's Court, as it was constituted in 1839, was a local court; that its jurisdiction was confined to local actions arising in the city, and to appeals and certioraris from the judgments of justices of the peace; that, in transitory actions, its jurisdiction was concurrent with the Court of Common Pleas of Erie county, and that it was inferior to the Supreme Court, inasmuch as its decisions were subject to review by that court; and that the amendatory act, constituting the Superior Court, is entirely inconsistent with *Page 247 
certain provisions of the Constitution. It will not be unprofitable, in connection with the discussion of this point, to pass through a brief review of the two acts.
The first section of the act establishing the Recorder's Court of Buffalo (Laws of 1839, 186) provides for the appointment of a recorder. The 2d section declares that the recorder alone, or, in case of his absence, the mayor and any two aldermen, shall hold a court of civil jurisdiction, to be called `The Recorder's Court of the City of Buffalo,' which shall be a court of record, and shall be held once in each month; that it shall have power to hear, try and determine, according to law, all local actions arising in said city and not elsewhere; and shall have exclusive jurisdiction in all cases of appeals from and certioraris on judgments rendered by any justice of the peace in said city; that in all transitory actions, the said court shall have, concurrently with the Court of Common Pleas of the county of Erie, the same power, authority and jurisdiction as is now vested in said Court of Common Pleas, and shall possess all the powers and authority of the Courts of Common Pleas of the several counties of the State; and all laws regulating proceedings in said courts shall be binding on it.
The 3d and 4th sections confer jurisdiction as to criminal matters, to the same extent as is possessed by Courts of General Sessions of the Peace. The 5th section provides for the appointment of a clerk by the recorder, and for a seal. Section 6 requires the sheriff of Erie county or his officers to attend the terms of the court. Sections 7 to 11, inclusive, relate to the manner of drawing and summoning grand and petit jurors. Section 12 requires the district attorney of Erie to prosecute all indictments pending in the court. Section 14 enacts that all process issuing out of the court shall be directed to the sheriff of the county of Erie. Sec. 17 declares that all judgments rendered in said court shall be a lien on real estate in the county of Erie, and any execution thereon may be executed in any part of the county.
The act constituting the Recorder's Court was amended by the act of 28th March, 1854. The 1st section of that act *Page 248 
declares that "the court known as the Recorder's Court of the city of Buffalo is hereby continued, with the additional jurisdiction conferred by this act." It shall be composed of three justices, and shall be known as the Superior Court of Buffalo. It shall be a court of record [so was the Recorder's Court], and its jurisdiction shall in all cases be presumed. But nothing in the act contained was to affect its jurisdiction of actions or proceedings then pending therein, or any judgment or order already made. The 2d section enacts, "that the said justices shall be elected by the electors of the city of Buffalo, and shall hold their offices for eight years;" and that the present Recorder of Buffalo shall, until the expiration of the term for which he was elected, be one of the said justices. The 3d 4th and 5th sections relate to the manner of electing and classifying the justices, and their compensation; the 6th, to the appointment of a clerk and crier; the 7th provides for a seal; and the 8th requires the attendance of the sheriff of Erie, or his deputies, upon the terms of the court.
The 9th section confers additional jurisdiction in relation to actions and proceedings where the cause of action arises, or the subject thereof is situate, in the city of Buffalo.
The 10th section confers jurisdiction, also, in all other civil actions, whether the cause of action arises, or the subject of the action be situate, in the city of Buffalo or not: 1. In an action arising on contract, when the defendant, or when one or more of several defendants, reside, or are personally served with the summons, or occupy a tenement for the transaction of his or their ordinary business, in that city, or when the contract was made in that city. There are other subdivisions to this section, not necessary to be noticed here.
Section 19 requires that appeals from the judgments at the general term shall be taken directly to the Court of Appeals.
Section 22 provides that four general and six special terms of the court shall be held in each year.
Subsequent sections regulate the practice and manner of entering judgments in particular cases; sections 31 to 36, inclusive, relate to criminal jurisdiction and matters; and, by *Page 249 
section 37, "all the provisions of law now in force relating to the Recorder's Court of Buffalo, and not inconsistent with the provisions of this act, shall apply to the said court, as organized by this act."
By the Constitution of 1846, article 6, section 14, subdivision 5, it was provided, that "inferior local courts of civil and criminal jurisdiction may be established by the Legislature in cities; and such courts (except for the cities of New York and Buffalo), shall have a uniform organization and jurisdiction in such cities." Here the subject of organization and jurisdiction, so far as New York and Buffalo are concerned, was left open for future legislative amendment and reënactment.
By section 21 of the same article, it was further provided, that the Legislature might authorize the judgments, decrees and decisions of any local inferior court of record of original civil jurisdiction, established in a city, to be removed for review, directly into the Court of Appeals.
By article 14, section 12, all local courts established in any city or village were to remain, until otherwise directed by the Legislature, with their present powers and jurisdictions.
It is insisted that under these provisions, the powers of the Legislature in relation to the establishment or alteration of these local courts, were limited; that the power to alter and enlarge the existing Recorder's Court, if any, was conferred under section 12 of article 14; that such power is limited by section 14 of the 6th article, and that consequently, the Legislature erred in enlarging and altering the powers, duties and title of the court. It is believed the counsel is mistaken in this position. By a recurrence to the several sections of the act instituting the Recorder's Court, it will be perceived, at a glance, that the power and jurisdiction were quite extended. It was a court of record. It possessed all the powers and authority of the Courts of Common Pleas of the several counties in this State. It had criminal jurisdiction to the same extent as Courts of General Sessions of the Peace, and it could send its executions to any part of the county. Now, suppose the Legislature had undertaken to enlarge the powers *Page 250 
and duties of the recorder alone, by granting some of those contained in the act creating the Superior Court, and thus continued the Recorder's Court; would the act have been unconstitutional? It is believed that it would not.
Section 12, article 14, was intended, undoubtedly, to give the Legislature the power to alter or enlarge as well as to abolish these local courts. Their existence, power and jurisdiction were all committed to the care of that body, especially those created in the cities of New York and Buffalo, which were exempted from the requisition in subdivision 5, section 14 of article 6, that inferior local courts (except for those cities) should have a uniform organization and jurisdiction in both cities.
The question then arises, whether the act amendatory of the act creating the Recorder's Court, and substituting for its title the Superior Court, made it an entire new court, so as to bring it within the prohibitory provisions of the Constitution. The 1st section continues it as the Recorder's Court, and declares that it shall be composed of three justices, and that it shall be known as the Superior Court of Buffalo. It provides for the election of the justices, except that the present recorder shall be one, and shall hold his office until the expiration of the term for which he was elected. It is not for us to inquire whether the object of the Legislature was to continue in this place the [then] incumbent of the recorder's office, and at the same time to create a Superior Court in Buffalo like that in New York or not. With legislative intent we have nothing to do in this case, except so far as it may bear upon the question of whether the act was or was not constitutional. The court, as enlarged, continued to be a court of record. Some additional powers and jurisdiction were conferred upon it. But it has been already observed that these were within the power of the Legislature, and the additional force or assistance added to the court by the creation of two new judges, did not tend to weaken its judgments, but rather to strengthen and increase their legal and moral effect. It is argued that the act neither abolishes the Recorder's court, nor establishes an *Page 251 
inferior court. It does not, indeed, abolish, but, on the contrary, it continues that court, altering its title. It was before an inferior local court, and it continues to be an inferior local court, with enlarged powers and jurisdiction.
It is further argued that it is made an independent court, (with the exception of its locality) a court, practically, with equal jurisdiction with the Supreme Court of the State; that it confers jurisdiction when the contract is made in the city of Buffalo, over the persons and property of a party in any part of the State, although neither are in the city.
The 10th section of the act, subdivision 1 (Laws of 1854, 225), declares, that the court shall have jurisdiction in all civil actions, whether the cause of action be situate in the city of Buffalo or not; and in an action arising on contract, when the defendant, or when one or more of several defendants, reside, or are personally served with the summons, or occupy a tenement therein, for the transaction of his or their ordinary business in that city; or when the contract was made within that city. This jurisdiction is recognized by the 33d section of the Code of 1852, subdivisions 1 and 2. It is there declared, that the jurisdiction of Recorders' Courts of cities shall extend to the actions enumerated in sections 123 and 124, when the cause of action shall have arisen, or the subject of the action shall be situated within those cities respectively; and to all other actions where all the defendants shall reside or are personally served with the summons within those cities, or where one or more of several defendants, jointly liable on contract, reside, or are personally served with the summons, within those cities respectively, except in the case of Mayors' and Recorders' Courts of cities; which courts shall only have jurisdiction where all the defendants reside in the cities in which such courts are respectively situated. These provisions are uniform as to all the cities, except as to New York and Buffalo, as has been before remarked. This court observe in the case of The People v.Sturtevant (5 Seld., 263), that under 2d and 3d subdivisions of section 33, jurisdiction is made to depend, in the "2dsubdivision, upon the residence of the *Page 252 
defendant, or the service of the summons within the city. In all other respects the jurisdiction is as wide as the definition of an action under the Code, and that is defined to be "an ordinary proceeding in a court of justice, by which a party prosecutes another party, for the enforcement or protection of a right, the redress or prevention of a wrong, or the punishment of a public offence." It is not correct, therefore, to say that it is an independent court. Its decisions are subject to review upon appeal though not by the Supreme Court, as was formerly the case; for the reason that the Legislature thought fit to provide, under section 21 of article 6 of the Constitution, that appeals from its judgments should be taken directly to the Court of Appeals.
It is again argued that the act appoints the recorder of Buffalo to be one of the justices, in direct violation of section 18 of article 6 of the Constitution, which declares that all judicial officers of cities and villages, and all such judicial officers as may be created therein by law, shall be elected at such times and in such manner as the Legislature may direct. It will be recollected that the Recorder's Court of Buffalo was established in 1839. As the Constitution and law then were, the recorder was appointed. By the law of 1847 the recorder was to be elected, and was to hold his office for the term of four years, from and after the first day of January succeeding his election. Under that law, the recorder in office when the act of 1856 was passed, was elected, and his term of office had not then expired. By section 12 of article 14, "all local courts established in any city or village, were to remain until otherwise directed by the Legislature; and the judges of such courts, and any of the clerks thereof, were to continue in office till the Legislature should otherwise provide. Judge HOUGHTON, the recorder continued to hold office under this provision, and so the Legislature deemed it when they continued him in office as one of the judges of the Superior Court. His court was enlarged; assistants to him were provided for and elected; the jurisdiction was increased; but the court was still a local and inferior court. *Page 253 
The act creating the court must be deemed to be constitutional.
II. The next point presented on the part of the defendant Woodruff is, that the court had no jurisdiction over him, for the reason that he did not reside in or occupy a tenement in the city of Buffalo. That he was not a joint defendant, and was not personally served with the summons in the city.
It has been already remarked that the 1st section of the act declares that jurisdiction shall in all cases be presumed; and this court, in the case of Bidwell Banta v. The Astor MutualInsurance Company (16 N.Y., 263, 267), in relation to this very court, after noting this, remarked: "That under the 10th section, if the action was on contract, and the contract was made in Buffalo, then jurisdiction in fact existed;" that "if jurisdiction was legally possible, it must be assumed to have existed." In other words want of jurisdiction, in any particular, must be proved affirmatively or it will in all cases be presumed. Now, how are the facts in relation to this matter. It appears that the note in question was dated at Buffalo, on the 26th day of April, 1855, that it was made by the firm of B. Bradley Co., which was composed of defendants Bradley and Pettebone; that it was payable to the order of Pettebone, and indorsed by him and afterwards by the defendant Woodruff. Bradley and Pettebone resided in, and the firm had their place of business in, Buffalo. The plaintiff was also located there, and discounted the note in the city for the makers from whom they then received the note. That the summons was served on Bradley and Pettebone in the city, and upon the defendant Woodruff at his residence in Dansville, Livingston county, he not at the time renting a tenement in Buffalo. For aught that appears, the contract was made in the city. By section 10, if the contract was made there, that was sufficient to confer jurisdiction. This is to be presumed in the absence of proof to the contrary. There is not only no such proof, but the evidence, as far as it goes, tends to establish the fact that the contract was made there. The note was executed by two of the defendants who resided there; it was dated *Page 254 
there, and handed to the plaintiffs at their counter, indorsed by all the defendants and discounted there: the proceeds being paid over to the makers, at the bank. Besides, the two makers resided in the city and the summons was served upon them there. It was entirely immaterial, therefore, where the summons was served on the defendant Woodruff. The court, by the act, acquired and possessed jurisdiction over him.
III. The court then having had jurisdiction of the action, the next question is, whether any defence was established. The first point presented by the defendants on this subject is, that the making of the note payable in New York, and the plaintiff, on discounting it, selling to Bradley Co. its drafts on New York for the amount, and receiving the premium thereon, render the note usurious. The case shows that the note was discounted by the plaintiff for the firm of B. Bradley Co., and that, on discounting it, the plaintiff intentionally took and received in advance the discount on the same at and after the rate of seven per cent per annum; that with the proceeds of the note Bradley 
Co. purchased of the plaintiff its drafts on the Commercial Exchange Bank in the city of New York, and paid to plaintiff, one-half of one per cent premium of exchange therefor.
This court had occasion to consider this point in the case ofMarvine v. Hymers (2 Kern., 223, 233); and deliberately decided that it is not usury on discounting commercial paper to take interest upon the full amount for which it was made, where it has not longer to run to maturity than is usual with paper discounted by bankers. Sixty days is not more unusual than three or four months. The same case also decided that the exacting of a premium of exchange on the drafts with which the proceeds of the discounted paper were paid, was not usurious. The court remarked that if the lender had made it a condition of the loan that the borrower should make his paper payable in New York, and should, upon the discount of such paper, insist upon paying the proceeds in drafts, charging a premium of exchange, they did not intend to say *Page 255 
what the law would be. There is no pretence in the present case, that any such condition was required or accepted.
In the recent case of Oliver Lee's Bank v. Walbridge, we had again occasion to examine this question, in which the same vïews were renewed and reënforced; and it is unnecessary here to repeat the conclusions, to which we arrived, or the reasons therefor. It is sufficient to say, that they disposed of this case, so far as the question of usury is involved, against the defendant.
It is again insisted, that the 33d section of the act of 1829, prohibiting the receiving by banks, under the safety-fund act, of more than six per cent on notes maturing in sixty-three days, is applicable to institutions organized under the general banking law. This question has also been settled against the defendants by the case of Curtis v. Leavitt (15 N.Y.R., 9). It was there expressly decided, that banking associations are not subject to the provisions of the act, and therefore not affected by section 35, which prohibits the issuing of bills and notes by monied corporations, "subject to the provisions of the act," unless payable on demand and without interest. (See pp. 157, 171.) It is urged that the 1st section of the act of 1829 is broad enough to include the general banks; but this point was adjudicated upon, and decided to be otherwise, in that case. The section was intended to apply only to such monied corporations as were subject to that act, which were banking corporations created by special charters. The same remark is applicable to the cases of the numerous special bank charters cited and referred to by the counsel, where the same prohibition exists. Under the provisions of the general banking law of 1838, a species of new banking corporations was authorized, and the necessity of special restrictions ceased. As well might the 35th section of the act of 1829 be said to apply to the banks under the general law, as the 33d section. But the Legislature thought otherwise as to the former section, in 1840; for, during the session of that year, an act was passed amendatory of the act of 1838, prohibiting associations from issuing any bill or note, unless the same should become "payable on *Page 256 
demand, and without interest." But it is sufficient, as already observed, that the question has been disposed of by the court.
It is, lastly, urged that the receiving the premium of exchange, on the drafts which were used to pay previous drafts discounted and owned by plaintiff, was a violation of the act, and rendered the note void. The remarks already made virtually dispose of this point. It is expressly found, that no agreement was made between the parties, or condition imposed; that the plaintiff had not any notice or information, at the time it discounted the note in suit, that the proceeds were to be used or applied by Bradley Pettebone to take up or pay the paper previously discounted by the bank. It was not proved that B. P. intended so to dispose of the proceeds. There is no evidence even that the discounting the note and selling the drafts were done at one and the same time, or were parts of the same transaction. The whole facts bring the case within those referred to; and the judgment must be affirmed.
STRONG, J., expressed no opinion; all the other judges concurring,
Judgment affirmed.